# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YANG PAO VUE, | Case No. 1:14-cv-01245-SKO |
| Plaintiff, | **ORDER AFFIRMING ALJ'S DECISION** |
| v. | (Doc. No. 1) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Yang Pao Vue ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 405(g); 1383. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 9, 10.)

**FACTUAL BACKGROUND**

Plaintiff filed an application for DIB and SSI on August 11, 2010, alleging disability beginning on July 21, 2008, due to an infection in his left leg. (Administrative Record ("AR") 197.) During the development of his claim, Plaintiff was found to have a mood disorder.

**A.   Relevant Evidence**

In December 2007, Plaintiff was seen by David A. Lucks, M.D., for chronic dermatitis/cellulitis of the left foot. (AR 408.) It was noted Plaintiff had had several recent flares of acute leg cellulitis with lymphangitis and lymphadenitis requiring hospitalization. (AR 408.) Dr. Lucks noted that his office had never seen a positive lab result, however, and Plaintiff had always responded to "empiric broad spectrum coverage directed at gram-positive organisms." (AR 408.)  Upon examination of his left leg, Plaintiff was noted to have a patch of chronic dermatitis of the left-ankle area, which was indurated, ruddy-brownish, and swollen. (AR 408.) Dr. Lucks recommended continuing with an antibiotic and following up in three months. (AR 408.)

On January 2, 2009, Plaintiff underwent a psychiatric evaluation by Timothy Cantry, MD. (AR 291.)  Plaintiff was driven to the appointment by his brother-in-law and walked with a cane. (AR 291.)  He told Dr. Cantry that he has had pain in his leg for about six years, and although he had surgery, it has not helped with the pain. (AR 291.)  He has difficulty standing and can only sit for about two to three hours before he needs to walk around.  He denied ever having mental health treatment, but stated he had been depressed since he was a kid.  Dr. Cantry observed Plaintiff was well groomed and arrived early for his appointment.  Plaintiff's performance on the concrete portion of the mental status examination "strongly suggested malingering" to Dr. Cantry. (AR 292.)  When Dr. Cantry asked him to recite three numbers Dr. Cantry had just listed, Plaintiff listed numbers at random.  Dr. Cantry also noted the following interaction:

> I pointed to three objects and asked him to remember them. About 30 seconds later I asked him to point to the objects. He claimed not to remember any of them. I asked him to look around and [] see if anything looked familiar. He pointed to a pillow on a chair and identified the pillow as "papers." I asked him to identify the papers and he again pointed to the pillow. I asked him to touch the papers. He got up and picked up the pillow and claimed that they were papers. I then showed him

the papers I was talking notes upon and asked him to tell me what they were. He said, "That's nothing."

(AR 293.) Dr. Cantry asked him how much five minus two equals, and Plaintiff responded "two." (AR 293.) Dr. Cantry asked Plaintiff to perform a simple two-step task with his right hand, and Plaintiff performed the first task and then claimed not to remember the second. (AR 293.) When asked about the similarities between an apple and an orange, Plaintiff claimed to have never tasted either. (AR 293.) When asked what he would do if he were home alone and the house caught fire, Plaintiff responded he would stay in the house. (AR 293.) When asked what would happen if Plaintiff stayed in the house during a fire, he responded he did not know. (AR 293.) Dr. Cantry concluded Plaintiff was malingering and was therefore unable to assess Plaintiff's functioning. (AR 294.)

On January 4, 2009, Plaintiff underwent an orthopedic consultation with Khyber Zaffarkhan, D.O. (AR 296-300.) Plaintiff reported lower back and left-leg pain since 2005 which was due to an injury. (AR 296.) He was told by physicians the source of his pain was due to a vein in his leg and that he should undergo "vein stripping"[2] to alleviate the pain. (AR 296.) Although he underwent the procedure, Plaintiff's leg pain did not abate. (AR 296.) Plaintiff described his pain as sharp and burning, which was exacerbated by sitting, walking, bending, and lifting. He uses a cane for ambulation and indicated he sometimes becomes dizzy. (AR 296.)

On examination, Plaintiff's lumbar spine range of motion was limited. (AR 299.) He was noted to have an "equine varus deformity" of the left foot and ankle, he was unable to walk on his heels or toes, and could not perform the squat test. (AR 299.) Dr. Zaffarkhan provided the following discussion of the examination results:

> . . . On clinical exam, he does appear to have signs of nerve root irritation stemming from his lumbar spine and for this reason, we will be obtaining an L-spine x-ray to evaluate for any gross pathology in his lumbar spine. Clinical exam findings do point towards radiculopathy and for this reason, this is our working diagnosis. The claimant currently has equine varus deformity of his left foot as noted.

(AR 300.)

---

[2] Vein stripping is a procedure to remove varicose veins.

3

Dr. Zaffarkhan gave an opinion regarding Plaintiff's functional abilities:

> The claimant appears to have moderate objective findings, so we will be limiting his lifting and carrying to 20 pounds occasionally and 10 pounds frequently. Standing and walking will be six hours out of [an] eight-hour workday and sitting will be six hours out of [an] eight-hour workday. Push and pull will be unlimited other than what was shown for lift or carry with the exception of left lower extremity, which we will limit only to occasional. Due to his equine varus deformity, and its necessity to ambulate with a straight cane[, we] will be placing postural limitations of climbing, stooping, and crouching to occasional. We will have [no] manipulative, visual[,] communicative, or environmental limitations.

(AR 301.)

On January 29, 2009, state agency physician S. Amon, M.D., reviewed Plaintiff's records and completed a physical residual functional capacity assessment. (AR 305-09.) Dr. Amon determined Plaintiff could perform light exertional work, stand and walk at least two hours in an eight-hour day, and sit with normal breaks for about six hours in an eight-hour day. (AR 306.) He opined Plaintiff was limited to only occasional climbing, kneeling, crouching, or crawling, frequent stooping, and no balancing. (AR 307.) He also marked that Plaintiff should avoid concentrated exposure to vibration and work hazards such as machinery or heights. (AR 308.)

A treatment note from the UC Davis Health System on August 10, 2010, indicates Plaintiff was seen in the Emergency Department for left-leg cellulitis. (AR 310.) He was provided antibiotics and directed to follow-up with his primary physician in one or two days. (AR 310.) Testing of the left leg was negative for deep vein thrombosis.[3] (AR 315.)

On November 11, 2010, Plaintiff underwent a comprehensive orthopedic evaluation by Fariba Vesali, M.D. (AR 336.) Dr. Vesali found atrophy of Plaintiff's left leg, the left leg was colder than the right, and there was discoloration of the distal and end of the left leg that Plaintiff reported was chronic. (AR 338.) There was also tenderness of the entire left leg. (AR 338.) Dr. Vesali gave the following opinion:

> The claimant should be able to walk and stand for four hours in an eight-hour workday with breaks every 30 minutes for rest and stretching. The limitation is due to chronic left lower extremity pain.

---

[3] Deep vein thrombosis ("DVT") occurs when a blood clot (thrombus) forms in one or more of the deep veins in the body, usually in the legs. DVT can cause leg pain or swelling, but may occur without any symptoms. *www.mayoclinic.org/disease-conditions/deep-vein-thrombosis/basics/definition/con-20031922*.

4

> He should be able to sit six hours in an eight-hour day with normal breaks.
>
> The claimant will benefit from using crutches for ambulation. The limitation is due to chronic left lower extremity pain.
>
> He should be able to lift and carry 10 pounds occasionally and frequently. The limitation is due to his left lower extremity pain and because the claimant ambulates with crutches.
>
> He should be able to do occasional climbing, stooping, kneeling, and crawling. The limitations are due to left lower extremity pain and possible complex regional pain syndrome.
>
> There are no manipulative limitations.
> There are no workplace environmental limitations otherwise.

(AR 339.)

In December 2010, state agency physician A. Lizarraras, M.D., reviewed Dr. Vesali's assessment and disagreed that there was evidence of a "severe" physical impairment. (AR 341.)

On April 30, 2011, Plaintiff underwent a comprehensive psychiatric evaluation with Aimee Riffel, PhD. (AR 342-47.) Plaintiff reported auditory and visual hallucinations. The auditory hallucinations "are command in nature and are often 3-4 individuals at one time laughing at him and telling him to kill himself and to kill his family." (AR 343.) Approximately three weeks before the examination, Plaintiff reported having a knife to his throat, but a friend stopped him. (AR 343.) During the interview, Plaintiff could not stop talking about killing himself and his family. (AR 344.) As a result, the interview was stopped, the Merced Police Department was notified, and Plaintiff was escorted to the Marie Green Psychiatric Center for possible hospitalization. (AR 344.) Although many facets of the mental status examination could not be completed, Dr. Riffel diagnosed Plaintiff with schizophrenia, paranoid type, and assigned him a Global Assessment of Functioning ("GAF") score of 40. (AR 346.) Dr. Riffel opined Plaintiff would have difficulty dealing with overall stress within the work environment due to mental health factors, and he is not capable of managing his own funds. (AR 346.)

Upon being removed from his examination with Dr. Riffel, Plaintiff was taken to the Crisis Stabilization Unit of Merced County Department of Mental health on an involuntary 5150 hold. (AR 361.) On examination, Plaintiff was cooperative, calm, and with a flat affect and a bizarre

stream of thought with poor impulse control. (AR 361.) He was transferred to the Marie Green Psychiatric Center the next day, where an examination was conducted by Isabel Manuel, MD. (AR 362.) Plaintiff was diagnosed with "Major Depressive Disorder, Recurrent, Severe, with psychotic features." (AR 363.) Isabel Manuel, M.D., prescribed anti-depressants with follow-up treatment and Plaintiff was released on May 2, 2011. (AR 364.)

On June 6, 2011, state agency physician Richard Betcher, M.D., reviewed Plaintiff's records and opined Plaintiff did not have a severe physical impairment. (AR 390.) Plaintiff's records noted that in a follow-up phone call, Plaintiff reported to SSA staff that his only allegation was depression. In reviewing this record, Dr. Betcher noted Plaintiff confirmed his pain was treated with only over-the-counter Tylenol, and his claim centered on his depression rather than his left-leg pain. (AR 391.) Dr. Betcher also noted that the November 2010 examination with Dr. Vesali revealed tenderness, but intact motor sensory function. (AR 391.)

A progress report from Merced County Mental Health dated July 20, 2012, noted Plaintiff was seen for medication management. (AR 401.) He reported no medication side-effects but complained of sleep disturbances, low energy, and depression. (AR 401.) He was noted to present with appropriate grooming and hygiene, he was calm, alert, cooperative, and oriented with appropriately linear thought process. (AR 401.) His Seroquel prescription was increased, and a prescription for Ativan was added. (AR 401.)

On September 3, 2012, Plaintiff underwent a psychiatric evaluation with Maximo A. Parayno, Jr., M.D. (AR 398-99.) During the examination, Plaintiff was alert and cooperative, although his appearance was disheveled, his hair was in disarray, and his shirt was crumpled. He was disoriented and did not know the precise day of the week or month. (AR 398.) He was unable to give the dates of births of any of his parents or siblings. (AR 398.) He admitted to visual hallucinations such as seeing ghosts at night who threaten to take him away. (AR 399.) Dr. Parayno diagnosed Plaintiff with Major Depressive Disorder, recurrent, severe with psychotic features, post-traumatic stress disorder, and a learning disorder. (AR 399.)

6

**B.     Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 115-19, 121-25, 128-29.) A hearing was held on September 12, 2012, before an ALJ. (AR 23-49.)

### 1.     Testimony of Vocational Expert at the Hearing

At the hearing, the ALJ solicited testimony from a Vocational Expert ("VE") about Plaintiff's past work and his ability to perform other work. (AR 44-49.) The VE testified Plaintiff's past work was characterized under the Dictionary of Occupational Titles ("DOT") as a machine operator, DOT 619.685-062, which is classified as medium, semi-skilled job. (AR 45.) He also had past work the VE characterized as an assembler of small parts, DOT 739.687-030, which is classified as light, unskilled work. (AR 45.)

The ALJ also posed a hypothetical for the VE to consider. The ALJ asked the VE to consider a person of the same age, education, and with the same work experience as Plaintiff who is able to understand and remember simple instructions; sustain attention and concentration for two-hour periods, complete a regular workday at an acceptable pace and attend on schedule; interact adequately in a casual setting and respond appropriately to constructive instructions; and respond to simple, infrequent changes in routine, but should be in a non-public work setting with exposure to others that is not too intense or prolonged. (AR 45.) The VE testified such an individual would be able to perform Plaintiff's past relevant work. (AR 45.)

Plaintiff's counsel also posed a hypothetical for the VE to consider. (AR 46.) Counsel asked the VE to consider a person who is limited as set forth in the ALJ's hypothetical, but who can only concentrate for 30 minutes at a time and must rest for 10 minutes after that. (AR 47.) The VE testified such an individual would not be able to perform any work. (AR 48.)

### 2.     Plaintiff's Testimony

Plaintiff testified he lives in Merced, and dropped out of school in the tenth grade. (AR 28.) His last job was as a machine operator, which he performed in Colorado. (AR 28.) He is unable to work due to an inability to stand up for more than 15 or 20 minutes due to chronic

pain in his left leg. (AR 32.) He has not had any treatment since his last surgery in 2007 because he does not have health care insurance. (AR 32.) He continues to have chronic pain in his left leg, which is constant, and walking too much or sitting too long aggravates the pain in his lower back and leg; other activities, such as kicking a ball, will also aggravate the pain. (AR 37.) He experiences trouble walking due to pain, and he can only walk for approximately 15 to 20 minutes.

As to his mental condition, he is depressed, hopeless, and suicidal. (AR 32.) He is seeing Dr. Manuel once a month due to feelings of sadness and depression. (AR 33.) He also saw Dr. Parayno two or three times. His symptoms include crying and feelings of hopelessness which occur approximately five days a week. (AR 39.) He also feels like he wants to kill himself. (AR 40.) He has explained this to his doctors, and they have held him for three or four days at Merced Mental Health. (AR 40.) He has been taking Prozac and muscle relaxer medication since May 2011. (AR 42.) He also takes Lorazepam for anxiety, which alleviates some of his symptoms. (AR 42.)

Plaintiff currently lives with his uncle and his uncle's family. (AR 34.) He is able to dress himself, but he does not prepare meals, do laundry, go shopping, perform any housework (AR 34), or take public transportation (AR 43). He has no hobbies and spends his time looking out the window or watching cartoons on television. (AR 34-35.) He does not attend any religious services or social organizations. (AR 34.) He does not take public transportation. (AR 43.)

He has trouble sleeping, and he is taking medication that he feels is helping him. (AR 35.) Side effects from his medication include muscle tenseness and sweating. (AR 35.) These symptoms occur daily of which he has informed his doctor, and he was given some muscle relaxers. (AR 41.) He is planning to go to Merced County Mental Health for counseling, but he has not started the counseling yet. (AR 36.)

**3.     The ALJ's Decision**

On October 18, 2012, the ALJ issued a decision, finding Plaintiff not disabled from July 21, 2008, through the date of decision. (AR 8-16.) Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since her alleged onset date of July 21, 2008

8

(AR 10); (2) Plaintiff had a severe impairment: mood disorder with psychotic features (AR 10); (3) did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1  (AR 12); and (4) had the residual functional capacity ("RFC")[4] to perform a full range of work at all exertional levels and is able to understand and remember simple instructions; sustain attention and concentration for two-hour periods to complete a regular workday at an acceptable pace and attendance schedule; interact adequately in casual settings and respond appropriately to constructive instructions; and respond to simple or infrequent changes in routine, but should be in a non-public work setting with exposure to others that is not too intense or prolonged. (AR 13.)  The ALJ found that Plaintiff was able to perform his past relevant work as a small parts assembler. (AR 15.)  The ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act at any time from July 21, 2008, through the date of decision. (AR 16.)

Plaintiff sought review by the Appeals Council on December 12, 2012.  (AR 22.)  The Appeals Council denied Plaintiff's request for review on June 3, 2014.  (AR 1-4.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981; 416.1481.

**C.   Plaintiff's Argument on Appeal**

On August 7, 2014, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  Plaintiff argues the ALJ failed to state any reasons for finding his pain testimony not credible, failed to ascribe proper weight to the opinions of Plaintiff's treating and examining physicians regarding his left-leg condition, failed to consider all of Plaintiff's limitations in assessing the RFC, and failed to pose a complete hypothetical to the VE.

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  Id.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

1    The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

### A.   The ALJ's Consideration of the Medical Evidence Was Legally Sufficient

The ALJ concluded that Plaintiff's history of left-leg cellulitis did not cause Plaintiff more than minimal limitation of the ability to perform basic work, and therefore it was non-severe at the Second Step of the sequential analysis. (AR 10-11.)

In making this Second Step determination, Plaintiff contends the ALJ impermissibly failed to mention or discuss Dr. Lucks' 2007 treatment note that Plaintiff "has had several recent flares of acute leg cellulitis with lymphangitis and lymphadenitis requiring hospitalizations." (AR 408.) Plaintiff maintains this statement was consistent with objective findings made in August 2010 when Plaintiff was seen at the emergency room for an abscess formation, cellulitis, and inflammation, which were all complications of lymphangitis. Nonetheless, the ALJ disregarded these objective findings. Moreover, the ALJ attributed no weight to the opinions of two board

11

certified orthopedist consultants on the basis that their opinions were not supported by or consistent with later findings. Plaintiff maintains the only evidence the ALJ relied upon in rejecting these orthopedists' opinions were notations in the August 2010 emergency treatment notes that there was no blood clot in Plaintiff's leg, no radiographic evidence for inflammation of the bone caused by infection, and Plaintiff was 5/5 in strength in his upper and lower extremities. Plaintiff argues merely noting a lack of *other* unrelated conditions or problems does not negate that Plaintiff suffered from chronic left-leg pain due to lymphangitis identified by Dr. Lucks in August 2007.

The Commissioner asserts Plaintiff's focus on Dr. Lucks' notations in 2007, which predate both the alleged onset date and the date of Plaintiff's previous denial of benefits, establishes no error on the part of the ALJ. Dr. Lucks' examination notes indicated cellulitis, which the Commissioner contends is a common bacterial skin infection that typically resolves quickly with antibiotic treatment. Dr. Lucks also identified lymphangitis and lymphadenitis, which are infections that are treatable with antibiotics and complete recovery is generally achieved in a matter of weeks or months. This evidence was over five years old at the time of the hearing and actually supports the ALJ's finding of no disability as both conditions are dermatological problems which respond well to conservative treatment. Although the ALJ did not expressly consider this 2007 examination note, Dr. Lucks' note itself is not significant and probative evidence the ALJ was required to consider.

Dr. Lucks' notes are not an opinion as to Plaintiff's functionality left-leg. Rather, the note reported Plaintiff's left-leg condition on December 3, 2007, and indicated Plaintiff would be treated for a flare up of cellulitis, which Dr. Lucks considered "stable" on "suppressive low dose clindamycin." (AR 408.) Dr. Lucks indicated his office would notify Plaintiff of lab results, and they would follow-up with him in three months to consider either stopping or refilling the clindamycin. (AR 408.) Plaintiff continued to suffer bouts of cellulitis, as evidenced by his treatment in August 2010 for left-leg cellulitis, but there was no indication this was anything more than an acute condition that would flare up at times and was treated with antibiotics. The fact that it was linked to lymphangitis or lymphadenitis by Dr. Lucks does not establish Plaintiff had a

more severe left-leg condition than assessed by the ALJ. While Dr. Lucks' 2007 treatment note establishes Plaintiff had acute skin conditions, this is not significant or probative evidence showing Plaintiff's functionality was somehow limited for a greater-than 12-month duration. Plaintiff appears to argue the 2007 treatment note provides an objective basis to support his complaints regarding his left-leg pain, but the acute nature of the conditions noted in 2007 does not explain the severity of limitation claimed by Plaintiff with regard to his left leg. The note is simply not probative of the severity of Plaintiff's claimed left-leg condition, and the ALJ did not err in failing to discuss it.

Although Dr. Zaffarkhan and Dr. Vesali both opined Plaintiff had problems with his left leg, they were equivocal about the origin, the ALJ noted there was a lack of objective findings to support their opinions, and they did not agree on the nature of his left-leg condition. While Dr. Zaffarkhan indicated in January 2009 that Plaintiff had possible lumbar radiculopathy and equine varus deformity of the left foot, in November 2010 Dr. Vesali found no evidence of either condition noted by Dr. Zaffarkhan but instead diagnosed chronic lower-left extremity pain related to a possible complex regional pain syndrome. A lack of clinical findings or inconsistency with clinical findings is a legitimate basis to discount a physician's opinion. *See Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995) (ALJ properly rejected physician's determination where it was "conclusory and unsubstantiated by relevant medical documentation"); *see also* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give the opinion.").

Neither of orthopedists' findings were corroborated by other objective medical findings made in August 2010 when Plaintiff appeared for emergency treatment for a recurrence of cellulitis on his left leg. (AR 312, 330.) The August 2010 radiographic evidence revealed no deep vein thrombosis and there was no radiographic evidence of osteomyelitis that could account for Plaintiff's allegations of chronic pain. (AR 315.) While Plaintiff argues the lack of vein thrombosis or osteomyelitis does not undercut Dr. Zaffarkhan's opinion, there are no apparent objective findings that support Dr. Zaffarkhan's conclusion as to Plaintiff's equine vargus deformity of his left foot, and subsequent treatment of Plaintiff's left foot in August 2010 did not

13

reveal objective findings to substantiate Dr. Zaffarkhan's opinion about Plaintiff's left foot, which the ALJ noted.

The August 2010 clinical findings were simply not consistent with Dr. Zaffarkhan's opinion. Dr. Vesali examined Plaintiff in November 2010, but noted no objective findings in the record to support the opinion Plaintiff had a possible complex regional pain syndrome resulting in chronic left lower extremity pain. (*See* AR 336-39.) Dr. Vesali also found Plaintiff would benefit from the use of an assistive device for ambulation, but the ALJ noted Plaintiff needed no such device at the hearing in 2012 which the ALJ found inconsistent with Dr. Vesali's opinion. (AR 11, 339.) State agency non-examining physicians Lizarraras and Betcher both noted there was insufficient evidence of a severe physical impairment in Plaintiff's left leg to satisfy the 12-month durational requirement (AR 341, 391), which the ALJ credited as more consistent with the lack of objective medical findings made in August 2010. In fact, as noted by Dr. Betcher in reviewing Plaintiff's records in 2011, Plaintiff himself conceded his left-leg pain was controlled with Tylenol. (AR 391.) The ALJ sufficiently discussed Dr. Zaffarkhan and Vesali's opinions but discredited them for lack of supporting objective clinical findings.

In conjunction with the reviewing physicians' opinions and other evidence in the record, the ALJ rejected the consultative orthopedic examiner's opinions with sufficiently specific and legitimate reasons. *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) ("reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it"). The ALJ's consideration of Plaintiff's left-leg condition was legally sufficient and not erroneous.

**B.    The ALJ's Consideration of Plaintiff's Pain Testimony Was Proper**

Plaintiff contends the ALJ failed to give any consideration whatsoever to Plaintiff's testimony regarding chronic pain in his left leg. Certainly there were objective medical findings of lymphangitis originating in Plaintiff's left leg, and therefore there was an underlying condition that could produce the pain of which Plaintiff complained. The ALJ's failure to consider Plaintiff's statements of his left-leg pain was error.

The Commissioner argues the ALJ's rejection of Plaintiff's pain testimony was specific and well-supported. The ALJ noted Plaintiff was malingering at his consultative examination in 2009, Plaintiff presented his symptoms inconsistently such as reporting no medication side effects during treatment, but testified he had daily side effects at his hearing only six weeks later; Plaintiff's statements about his educational history were inconsistent; and Plaintiff knew his address and date of birth, but claimed not to know his age, height, and weight at the hearing. (AR 15.) Moreover, the medical evidence relating to Plaintiff's left leg was considered, but the ALJ concluded there was no medically determinable condition that could cause the pain Plaintiff alleged. The ALJ also noted at the hearing a gap in treatment, no recent treatment for cellulitis, and no x-ray or MRI findings to support a disabling physical impairment in his left leg. The absence of medical evidence is another legitimate basis for the ALJ to discount Plaintiff's credibility.

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009);

20 C.F.R. §§ 404.1529, 416.929.

The ALJ gave several reasons for finding Plaintiff generally less than fully credible. He indicated Plaintiff's presentation as to his mental health symptoms was very different among examiners. During treatment, Plaintiff was noted to be oriented and engaged appropriately, but when he was evaluated by Dr. Parayno, he was reportedly disoriented. (*Compare* AR 401 (noting linear thought process on evaluation in July 2012) *with* AR 398 (appearing disoriented in September 2012 upon evaluation and not able to give the week, month, or year). Although Plaintiff reported suffering medication side effects at the hearing (AR 35), his treatment record showed no reported side-effects (*e.g.*, AR 401.) Further, the ALJ noted Plaintiff had reported he dropped out of school in the 10th grade (AR 28), but then stated he completed the 11th grade (AR 202). These are the types of inconsistencies that may properly be the basis of an adverse credibility determination, even to the extent they are not specifically related to inconsistencies about Plaintiff's left-leg condition. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), *as amended on September 17, 1997* (in weighing plaintiff's credibility, the ALJ may consider "inconsistencies either in [plaintiff's] testimony or between his testimony and his conduct"); *see also Fair v. Bowen*, 885 F.2d 597, 604 n.5 (9th Cir. 1989) (an ALJ can reject pain testimony based on contradictions in plaintiff's testimony).

Beyond these inconsistent statements, the ALJ considered the finding of malingering by Dr. Canty and the large gap in treatment for his leg pain as factors that undermined Plaintiff's credibility generally. A noted failure to be candid at an examination is a general credibility factor that the ALJ may legitimately consider. *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (ALJ properly considered claimant's failure to give maximum or consistent effort during examination); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (claimant's lack of cooperation at examination was substantial evidence to support credibility finding). Additionally, there was a large gap in treatment. Plaintiff had sought no treatment for his leg since August 2010; and had only irregular treatment for his mental health since 2011. Unexplained gaps in treatment or insufficiently explained basis for a lack of treatment may be legitimately considered

in making an adverse credibility determination. *Fair v. Bowen*, 885 F.2d 597, 603-04 (1989). Plaintiff's attorney conceded at the hearing there was no explanation for the large treatment gap. (AR 36.)

These factors, taken together, were sufficient for the ALJ to find Plaintiff's lay testimony about his leg pain to be less than fully credible and conclude that the left-leg pain caused no more than minimal impairment in his ability to function.

**C.     Plaintiff's Remaining Arguments**

Plaintiff also argues that because the ALJ failed to properly weigh the medical evidence and evaluate his credibility, Plaintiff's left-leg limitations were improperly left out of the RFC and were not presented to the VE in a proper hypothetical. As the Court finds no error with regard to the ALJ's consideration of Plaintiff's left-leg condition, the ALJ's RFC and the hypotheticals presented to the VE were proper and without error as to Plaintiff's alleged left-leg limitations.

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security and against Plaintiff Yang Pao Vue.

IT IS SO ORDERED.

Dated:     **January 21, 2016**                              **/s/ Sheila K. Oberto**
                                                          UNITED STATES MAGISTRATE JUDGE